**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| John Willard Greywind, | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  1:10-cv-006 |
| | ) | |
| James T. Podrebarac, Leann Bertsch, | ) | |
| Patrick Branson, and Kathy Bachmeier, | ) | |
| | ) | |
| Defendants. | ) | |

Before the court are defendants' Motion for Summary Judgment (Doc. No. 27) and Greywind's Motion for Class Certification (Doc. No. 23).    For the reasons set forth below, it is recommended that defendants' motion be granted and plaintiff's motion be denied.

I.      **BACKGROUND**

Greywind is an inmate at the North Dakota State Penitentiary ("NDSP").  Defendant Branson is the NDSP's deputy warden defendant, defendant Bachmeier is the Medical Director, and defendant Podrebarac is the prison dentist.  Defendant Bertsch is the Director of the North Dakota Department of Corrections and Rehabilitation ("NDDOCR").  She has supervisory responsibility for all of North Dakota's correctional facilities, including the NDSP.  She is also the final decision maker for inmate grievance appeals.

In September 2009, Greywind damaged one of his teeth, allegedly by biting on a bone chip in a hamburger, and the tooth became infected.  Greywind asked to have the tooth repaired with a crown and a root canal to deal with the infection.  According to Greywind, defendants refused this treatment and offered extraction as the only treatment option.

1

Greywind grieved the refusal to provide the treatment he requested all the way up to defendant Bertsch. When he was unsuccessful, he filed this action against the defendants in both their official and individual capacities seeking injunctive relief and damages, based on the claim that the defendants' refusal to repair the tooth and instead offer only extraction violated his Eighth Amendment rights.

Defendants deny any Eighth Amendment violation and claim both Eleventh Amendment and qualified immunities. Also, in response to the motion for class certification, defendants argue that Greywind has failed to properly raise a constitutional challenge to the NDDOCR's dental policies and that, in any event, he lacks standing to pursue such a challenge.

Since the filing of the pending motion for summary judgment, the time periods for discovery and disclosure of expert witness reports have passed, and Greywind has not attempted to further supplement the record.

## II.   STANDARD OF REVIEW

The following well-established principles govern the court's consideration of the defendants' motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than"must show there is sufficient evidence to support a jury verdict in [her] favor." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant .1999). "Factual disputes that

are irrelevant or unnecessary will not be counted," <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden, <u>id.</u> at 252, 106 S.Ct. 2505.

<u>Uhiren v. Bristol-Meyers Squibb Company, Inc.</u>, 346 F.3d 824, 827 (8th Cir. 2003); <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380-81 (2007).

## III.   DISCUSSION

### A.   Merits of Greywind's Eighth Amendment claim

#### 1.   What the record reveals

What follows is a discussion of the relevant portions of the record established by the affidavits and documents that have been filed with the court. Except as otherwise indicated, the facts are not contestable.

Greywind claims he damaged his tooth while biting on a bone chip contained in a hamburger on September 15, 2009. (Doc. No. 5, p. 5).  He first saw Dr. Podrebarac on September 18, 2009, and then again a week later on September 25, 2009.  The NDSP dental records for these visits reflect that Greywind initially complained about soreness in his right posterior teeth, that he was given Ibuprofen on both occasions, and that a soft diet was ordered follow the visit on the 25th.  (Doc. No. 27-1, pp. 1-2, 7-8).  Also, while notes of the first visit are silent as to a cause, the notes for the September 25 visit do reflect:  "continuation of soreness as last week after biting bone in food."

Dr. Podrebarac saw Greywind four times in October 2009.  According to the records of these visits, swelling was observed in the buccal vestibule in the area of tooth numbers 3 and 4 and blood was drained.  X-rays were also taken and a periodontal abscess was confirmed.  Dr. Podrebarac cut and drained the infected area, and antibiotics were administered to treat the abscess.  (Doc. No. 27-1, pp. 2, 9-12).

Greywind next saw Dr. Podrebarac on November 10, 2009, after a reoccurrence of the infection.  X-rays were again taken, which showed a possible root fracture in tooth #4.  Dr. Podrebarac prescribed antibiotics and stated in his notes that a follow up visit would be scheduled in 7-10 days to consider extraction.  (Doc. No. 27-1, pp. 2 & 13).

Greywind then saw Dr. Podrebarac on November 17, 2009.  Dr. Podrebarac's notes again reflect a suspected fracture, *i.e.*, "suspect cuspal fx by occlusal eval," and that he offered "extract when pt ready." According to the notes, Greywind decided to "wait a little longer and see how it goes." (Doc. No. 27-1, pp. 3 & 14).

While the November 17 notes reflect the offer of extraction, they do not express the reasons why Dr. Podrebarac made the offer.  In his affidavit, Dr. Podrebarac states in a separately numbered paragraph leading up to his summary of the November 17 examination:  "Based on my experience, root fractures are nonresponsive to endodontic therapy and are almost exclusively treated with extraction." (Doc. No. 27-1, pp. 2-3).  Defendants rely upon this statement for their argument that the  offer of extraction was based upon the exercise of Dr. Podrebarac's  independent professional judgment.

That *may* have been the case.  But, whether intentional or not, Dr. Podrebarac stops short of stating that this was the reason for his offer of extraction *at the time*.  And, more fundamentally, there is other evidence that creates a fact issue as to whether Dr. Podrebarac's recommendation of extraction in November 2009 was based upon his an independent medical judgment uninfluenced by the NDDOCR's dental policies or whether it was based upon the NDSP's "no crown" policy.

One of the pieces of evidence creating the fact issue is the portion of the "Inmate Handbook" dated July 2008 that appears to set forth the NDDOCR's dental policies.  In part, it states:

4

"Implants, fixed bridges, and crowns will not be provided."  (Doc. No. 32-1, pp. 1-3).  In response, defendants do not deny the existence of the "no crown" policy.   Rather, they argue it never came into play because Dr. Podrebarac relied upon his independent judgment. But, as already discussed, Dr. Podrebarac does not directly state in his affidavit or his treatment notes what the actual reason for the offer of extraction was at the time.  Also, there is notably absent from the defendants' response any suggestion that Dr. Podrebarac would have been allowed to crown Greywind's tooth contrary to the NDDOCR's express "no crown" policy if he had concluded it was a viable treatment option.

Also creating doubt about the actual reason behind the offer of extraction is what occurred after Greywind filed grievances over the refusal to repair his tooth.  The defendants point to certain statements made in the responses to the grievances as proof that the offer of extraction was based upon Dr. Podrebarac's independent medical judgment, uninfluenced by the NDDOCR's dental policies.  Again, while that *may* have been the case, the final decisions of deputy warden Branson and by Director Bertsch on appeal are at best equivocal on this point, and arguably do nothing more than enforce the NDDOCR's "no-crown" policy.

Greywind filed his first grievance on November 25, 2009, stating that he had suffered a fracture of his tooth as a result of having bitten on a bone chip while eating a hamburger on "October 19, 2009."  He argued that, in lieu of extraction, he was entitled to have his tooth repaired. (Doc. No. 27-2, p. 7).

Before prison staff ruled on the grievance, they obtained a written response from Dr. Podrebarac dated November 30, 2009.  In his response, Dr. Podrebarac mentioned that he "suspected" a root fracture and that Greywind wanted to wait on extraction.  However, he was

5

otherwise silent about whether or not a root canal and crown was a viable option or if extraction was the only treatment possibly.  He then went on to discuss that there was nothing in his records that provided a linkage between Greywind's current tooth problem and the allegation in his grievance that he bit on a bone chip on "October 19, 2009."  However, earlier in his summary of Greywind's course of treatment, he did note that on 9/18/2009:  "pt reports sore posterior after occluding on bone."  (Doc. No. 27-2, p. 8).

After receipt of Dr. Podrebarac's response, defendant Branson denied Greywind's grievance on  December 10, 2009, stating that Greywind could not possibly prove that his tooth problem was caused by biting on a bone chip on "October 19, 2009" given he had started complaining about the tooth a month earlier.   Branson then went on state that "[if] John wants his tooth capped he can go through regular process to get that done."  (Doc. No. 27-2, p. 9).  While Branson did not explain what he meant by "regular process," one possibility is that Greywind could only get his tooth repaired if he paid for it himself.

Greywind responded to this decision by filing another grievance in which he stated he had made a mistake about the date in which he had bitten on the bone chip and that it actually took place on September 15, 2009.  (Doc. No. 27-2, p. 10).  This time the initial response to Greywind's grievance came from defendant Bachmeier, who, as noted earlier, is the medical director for the NDSP and an RN.  In her response, she told Greywind that he likely had a pre-existing condition that had weakened his tooth before biting on any bone chip and that Dr. Podrebarac would be visiting with him as to why a crown was not an option   She also told Greywind that he had bone loss, gum disease, and that his tooth was filled with bacteria.[1]  (Doc. No. 27-2, p. 10).

_____

[1]  Notably, Dr. Iravani, the dentist and oral surgeon who saw Greywind months later and after this action was filed, does not appear to rely upon gum disease, bone loss, or bacteria as the reason why the tooth could not have then

6

Greywind replied to this by stating that he understood that any problems with bacteria could be corrected by a root canal prior to crown. (Doc. No. 27-2, p. 11). Defendant Branson did not delve into these issues, however. He denied the grievance on the grounds that Greywind had still not offered proof that a bone chip had caused his tooth problem, suggesting that Greywind was now claiming an earlier date for his encounter with a bone chip simply to fit the facts, which implied that he was being untruthful. And, while Branson concluded his decision by stating that the dentist would determine the "appropriate treatment," this does nothing more than beg the question of whether the appropriate treatment would be based upon the independent medical judgment of the Dr. Podrebarac or whether it would be what was appropriate within the constraints of the NDDOCR's dental policy. (Doc No. 27-2, p. 11).

In making his decision, Branson apparently did not review the dental records or consult with Dr. Podrebarac about Greywind's claim that he had made a mistake about the date. As noted earlier, Dr. Podrebarac's record of September 25 indicated that Greywind had contemporaneously complained about biting on a bone chip. (Doc. No. 27-1, p. 8). Also, Dr. Podrebarac's written response to Greywind's first grievance noted the same thing - albeit without highlighting it - before going on to discuss that the medical history was not consistent with his biting on a bone chip on "October 19, 2009." (Doc. No. 27-2, p. 8). Finally, in his affidavit to the court, Dr. Podrebarac acknowledges that Greywind complained about biting on a bone chip when he first saw him on September 18, 2009. Presumably, he would have said the same thing back then if he had been asked by Branson. (Doc. No. 27-1, p. 1, ¶4).

Greywind then appealed Branson's decision to defendant Bertsch. In her decision denying

_____

been repaired. Her report is discussed in more detail later.

the appeal, she stated she agreed with Branson's handling of the matter and repeated his observation that Greywind was claiming he bit on the bone chip at an earlier date simply to fit the facts.  She then concluded her denial by stating that the prison dentist should determine the appropriate treatment, adding the following qualification:

> The institution has established protocols regarding the types of dental work that will be provided and the *dentist will act in accordance with those policies*.

(emphasis added).  (Doc. No. 27-2, p. 14).

In summary, there appears to be a fact issue regarding whether the actual basis for the denial of a root canal and crown in the November and December 2009 time frame was based on the independent medical determination of Dr. Podrebarac that it was not then a viable treatment option or whether it was based upon the NDDOCR's  "no crown" policy.  Also, there is nothing in the record which suggests that Dr. Podrebarac would have been given permission to crown Greywind's tooth, even if it was a viable treatment option, given the "no crown" policy.

After defendant Bertsch denied Greywind's grievance appeal on February 3, 2010, Greywind continued to refuse Dr. Podrebarac's offers of extraction.  Instead, he filed this action on February 12, 2010, seeking, among other things, a court order requiring the defendants to repair his tooth.  On August 18, 2010, the court denied Greywind's request for preliminary injunctive relief. (Doc. No. 17).

During the pendency of Greywind's prison grievance and his later attempt to obtain temporary injunctive relief here, Dr. Podrebarac continued to treat his symptoms.  Between December and June 2010, Dr. Podrebarac saw Greywind approximately ten times. Also, in his treatment note of June 25, 2010, Dr.  Podrebarac stated he would seek approval for a consult with

an oral surgeon.  Apparently, the request was approved because Greywind was seen on October 12, 2010, by Dr. Iravani, a Bismarck oral surgeon who is both a DMD and MD.[2]

Dr. Iravani prepared a written report of her examination.  (Doc. No. 27-1, pp. 26-27).  In her report, she concluded that a root canal and crown was not viable option given the extent of the fracture at the time of her examination.  She noted she had not seen the tooth back in 2009 and commented that some fractured teeth can be repaired.  However, she then opined that the immediate occurrence of the infection following the trauma to the tooth suggested that the severity of the fracture in 2009 was such that even  "heroic measures" to save the tooth would likely have been unavailing and tooth "failure/extraction" the likely eventual result.[3]

Dr. Iravani recommended immediate extraction and stated she would be available to perform the procedure.  That, however, never came to pass.  Greywind states in his reply brief that the tooth fell out on its own.

Greywind has not offered any evidence countering the opinions that have been offered by Dr. Podrebarac and Dr. Iravani.

---

[2]  Defendants' brief describes this consult as a "second opinion."  If by this they are implying there was  the possibility of treatment other than extraction depending upon the results of the "second opinion,"  that seems doubtful.  First, Dr. Iravani did not see Greywind until more than a year after Greywind was first seen by  Dr. Podrebarac, and almost nine months after his grievances requesting a root canal and crown had been denied , with no attempt being made during  those time frames to obtain a "second opinion."  Second, it appears from Dr. Podrebarac's notes that the reason why *he* recommended a "consult" with an oral surgeon (he never uses the term "second opinion" in his notes) is because he did not want to be the person to extract the tooth given that Greywind had complained about his competency to the state licensing authority.  (Doc. No. 27-1, p. 25).  Third, while there is no statement by the remaining defendants as to why the consult was approved, the fact that this action had been filed may have a motivating factor, particularly given the scope of Dr. Iravani's report, specifically that it addressed what may have been the situation a year earlier.  Finally, given the NDDOCR's dental policies, there is no reason to believe the defendants would have provided a repair of Greywind's tooth if Dr. Iravani had concluded that repair was then possible despite the passage of time.

[3]  Dr. Iravani's reliance upon clinical evidence suggests that the x-ray evidence in November 2009 was inconclusive regarding the extent of the fracture.  This is consistent with Dr. Podrebarac's contemporaneous notes that repeatedly refer to a suspected fracture.

## 2.     The lack of a triable Eighth Amendment claim

Prison officials violate the Eighth Amendment "if they commit 'acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs.'" Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting Estelle, 429 U.S. at 106) (alteration in original). Specifically, the inmate must show "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004) (citing Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992) (citing Randall v. Wyrick, 642 F.2d 304, 308 (8th Cir. 1981) (overruled on other grounds); Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir. 1985)).

In this case, while there may be facts in dispute as to what role the NDSP's "no crown" policy played when Greywind was offered extraction as the only treatment option, Dr. Podrebarac and Dr. Iravani have both opined that crowning the tooth was likely never a viable option, even with a root canal, and, more importantly, that extraction was an acceptable treatment option given the tooth's problematic condition. Since Greywind has not offered anything that controverts these opinions other than his belief that a root canal and crown were appropriate treatment, there is no triable Eighth Amendment claim and the defendants are entitled to summary judgment for this reason. E.g., Meuir v. Greene County Jail Employees, 487 F.3d at 1119 (quoting Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot

create a question of fact by merely stating that [he] did not feel [he] received adequate treatment.");
see also Hartsfield v. Colburn, 491 F.3d at 397- 99; Beck v. Skon, 253 F.3d 330, 333-34 (8th Cir.
2001) (defendants were not deliberately indifferent where plaintiff refused to comply with
recommended treatment).[4]

### B.    Defendants are entitled to qualified immunity

 Qualified immunity shields governmental officials in their personal capacities from suit for
money damages unless (1) they have violated a federal statutory or constitutional right, and (2) that
right was "clearly established" at the time of the challenged conduct.  E.g.,  Harlow v. Fitzgerald,
457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests -the need to hold
public officials accountable when they exercise power irresponsibly and the need to shield officials
from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.
Callahan, 555 U.S. 223, 231 (2009).   When qualified immunity is raised as a defense, the court has
the discretion to decide which prong to tackle first - a point that the Supreme Court has recently
clarified.  Id. at 236.

Turning first to the second prong, it appears that the cases in which the courts have actually
held an "extraction only" policy to be  unconstitutional are few.  One case that is frequently cited
is Heitman v. Gabriel, 524 F. Supp. 622 (W.D. Mo. 1981) ("While it is by no means unprecedented
for an old-fashioned prison regime to offer tooth extraction as the 'only dental care' [citation
omitted] no case has been found where such a limitation has been deemed judicially tolerable."); see

---

[4]  Other than to claim he should have been provided with a root canal and crown, Greywind does not raise any
other issues with respect to the dental care that was provided.  Notably,  prior to the time that Dr. Podrebarac developed
his working diagnosis of a suspected fracture and offered to extract the tooth, he provided Greywind with immediate and
continuing care.  In addition, after extraction was offered, Dr. Podrebarac continued to treat Greywind's symptoms and
made clear that extraction would be provided if he changed his mind.  Finally, Greywind has not claimed he was ever
refused palliative care when he requested it.

Stack v. McCotter, 79 Fed. App'x 383, 389.4 (10th Cir. 2003) (citing Heitman); Michel B. Mushlin, 1 Rights of Prisoners § 4.14 (4th ed., database updated Oct. 2010) (same).  Heitman, however, is an extreme case.  There a county jail had refused to provide any dental care short of extraction - not even routine dental fillings when that would suffice to alleviate an inmates' pain.

There are other cases, however, where the courts have suggested that "extraction only" policies might violate the Eighth Amendment -  in certain circumstances,  or have concluded that the issue is an open one.  See, e.g.,  Chance v. Armstrong, 143 F.3d 698, 703-704 (2d Cir.1998); Mitchell v. Liberty, No. 8-341-B-W, 2009 WL 33435, at **4-5 (D. Me. 2009).   One notable case is the Second Circuit's decision in Chance, supra, where the court overturned a summary dismissal of a § 1983 action in which a prisoner had alleged that his Eighth Amendment rights had been violated when extraction was the only treatment offered, and according to the prisoner, "there were less invasive procedures that would have saved his teeth." Id. at 704.  Without making a definitive ruling, the Second Circuit suggested that extraction might be constitutionally deficient if it was offered simply because it was an "easier and less efficacious treatment" and was not based upon the exercise of sound medical judgment.  Id. at 703.  One of the cases that the court cited as authority was Dean v. Coughlin, 623 F. Supp. 392 (S.D.N.Y. 1985), which the court characterized as "holding that 'dental needs for fillings, *crowns* and the like - are serious medical needs as the law defines that term.'" Chance, 143 F.3d at 703 (quoting Dean, 623 F. Supp. at 404) (emphasis added).[5]  On the

_____

[5]  The Second Circuit's citation to Dean noted that it had vacated the district court's order in that case on "other grounds" at  804 F.2d 207 (2d Cir.1986).  Chance v. Armstrong, 143 F.3d at 703.  The district court in Dean had entered a temporary injunction requiring the State of New York to implement a detailed plan for providing dental care at one of its prisons for women that included provisions for tooth repair and restoration. On appeal, the Second Circuit vacated the district court's order, concluding that overall it had gone too far, but it did direct compliance with a less onerous plan, which, from the limited facts, appears to have also included provisions for tooth repair and restoration. However, Dean's precedential value is limited by the fact it involved the grant of temporary relief and New York had agreed to the alternative plan.  Also, the Second Circuit had this to say as to when it rejected the district court's plan:

Under all of the circumstances, it was an abuse of discretion for the district court not to use

other hand, a number of courts have held that prison policies that offer extraction in lieu of such

things as crowns, implants, and even root canals in certain situations do not violate the Eighth

Amendment.  E.g., James v. Pennsylvania Dept. of Corrections, 230 Fed.Appx. 195, 2007 WL

1231730, *1-2 (3d Cir. 2007) (unpublished per curiam decision) (concluding that there was no

Eighth Amendment claim for an extraction that was within the policy of providing for extractions

and not root canals for abscessed teeth, and the decision was not based on any ulterior motive other

than routine patient care); Koon v. Udah, No. 8:06-2000, 2008 WL 724041, at *7 (D.S.C. Mar.17,

2008) (no Eighth Amendment violation where prison offered extraction only and not a root canal

and crown at state expense based on prison policy); Wilkens v. Ward, No. Civ-05-254-M, 2007 WL

2407082, at *6-7 (W.D. Okla. Aug. 22, 2007) (no Eighth Amendment violation where prisoner was

refused a root canal and offered extraction only pursuant to prison policy); Del Muro v. Federal

Bureau of Prisons, No. 5:03-CV-214-B, 2004 WL 1542216, at * 3-4 (N.D. Tex. July 8, 2004) (no

Eighth Amendment violation where the prisoner was offered extraction only pursuant to prison

policy and not the crowns or a bridge that he claimed he was entitled to); Kopera v. Cook County

Bd. of Com'rs, 1994 WL 577238, No. 93-C-3934, at *5 (N.D. Ill. Oct. 18, 1994) (rejecting an

---

the State's carefully and conscientiously formulated remedial plan as the basis for relief, with such
modifications as might appear essential to assure compliance with minimum constitutional
requirements. It must be remembered that the State is not constitutionally obligated, much as it may
be desired by inmates, to construct a perfect plan for dental care that exceeds what the average
reasonable person would expect or avail herself of in life outside the prison walls. The BH correctional
facility is not a health spa, but a prison in which convicted felons are incarcerated. Common
experience indicates that the great majority of BH prisoners would not in freedom or on parole enjoy
the excellence in dental care which the plaintiffs understandably seek on their behalf. We are governed
by the principle that the objective is not to impose upon a state prison a model system of dental care
beyond average needs but to "provide the minimum level of [dental] care required by the
Constitution." Ruiz v. Estelle, supra, 679 F.2d at 1150. "The Constitution does not command that
inmates be given the kind of medical attention that judges would wish to have for themselves...." Id.
at 1149. "[T]he essential test is one of medical necessity and not one simply of desirability." Woodall
v. Foti, 648 F.2d 268, 272 (5th Cir.1981) (citation omitted).

Dean, 804 F.2d at 215.

inmate's constitutional challenge to a prison policy whereby only extraction services are provided); see also Brathwaite v. Corr. Med. Servs., 630 F. Supp. 2d 413 (D. Del. 2009).

Also, there are courts that have held that extraction in lieu of restorative work did not violate the Eighth Amendment, but it is not clear from the facts of those cases whether the offer of extraction was based upon a determination that it was an appropriate treatment under the prisoner's particular circumstances or a blanket prison policy. E.g., McQueen v. Karr, 54 Fed.Appx. 406 (table), 2002 WL 31688891, at *1 (5th Cir. 2002) (unpublished per curiam); Campbell v. St. Clair County Jail, 2:08-cv-10224, 2008 WL 186376, at *2 (E.D. Mich. Jan.22, 2008).

The Eighth Circuit has yet to explicitly weigh in on this issue. In Moore v. Jackson, 123 F.2d 1082 (8th Cir. 1997), the court overruled a district court's grant of summary judgment in favor of prison officials and allowed a prisoner's Eighth Amendment claim to proceed in a case where treatment for a troubled tooth had been unreasonably delayed. In its discussion of the seriousness of the prisoner's medical condition, the court noted that, in addition to the evidence of pain suffered by the prisoner during the delay in treatment, there was also evidence that the delay eliminated the possibility of restoring the tooth and ensured extraction. Id. at 1087 n.3.

In Davis v. Norris, the court affirmed the dismissal of an inmate's claim that jail staff had exhibited deliberate indifference to his serious dental needs by denying him a root canal. Davis v. Norris, 198 F.3d 249 (Table), 1999 WL 1006437, at *1 (8th Cir. 1999). However, the dispute in that case centered not on a particular jail policy but rather competing recommendations from two dentists; one examining dentist had recommended a root canal and while the other had recommended an extraction. The Eighth Circuit simply concluded that a disagreement over a particular type of treatment did not give rise to an Eighth Amendment claim.

A dispute over the constitutionality of a jail's extraction-only policy was front and center in Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007). There an inmate asserting a claim of deliberate indifference to his dental care sought to end the Greene County Jail's unwritten extraction-only policy. The Eighth Circuit observed that, prior to filing suit, the inmate had been transferred from the Greene County Jail to another facility where his dental ailments had apparently been treated without complaint. Given that the inmate did not anticipate ever returning to the Greene County Jail, the court concluded he had not demonstrated a likelihood of future injury and therefore lacked standing to challenge the extraction-only policy.

Based on the foregoing, it is apparent that there is no "clearly established" right on the part of prisoners to dental treatment in the form of crowns and implants in lieu of extraction, particularly when the latter appropriately resolves the underlying problem and does not unduly compromise the prisoner's health. Consequently, in addition to a dismissal on the merits, defendants are also entitled to qualified immunity with respect to the claims against them personally for money damages.[6]

---

[6] The dental policies set forth in the Inmate Handbook are more complex than what has been discussed so far. For example, although the policy does not provide for "implants, fixed bridges, or crowns," it does cover routine preventive care and fillings, subject to a small co-pay, which, presumably can be recovered after-the-fact when circumstances warrant. Also, there are provisions that appear to address the level care that will be afforded to insure that a prisoner maintains some ability to eat, e.g., providing "essential prosthetics." In order to assess the adequacy of the NDDOCR's dental policies under the Eighth Amendment, it appears that the policies as a whole would need to be considered. Also, what is not disclosed from the limited record before the court is the extent to which the officials in particular institutions are permitted to deviate from the NDDOCR's policies if the recommendation to do so is made by a doctor, dentist, or other qualified medical professional based upon the circumstances of the particular case. Given the complexity of the issues, prudence dictates stopping here and not considering the first prong of qualified immunity. Ashcroft v. al-Kidd, __ U.S. __, 131 S.Ct. 2074, 2080 (2011) ("Courts should think carefully before expending "scarce judicial resources" to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'") (citing Pearson v. Callahan, 555 U.S. at 236-237). However, given the weight of existing authority, any prisoner claim for better dental care than what can be afforded by the poor and working poor in this country would face an uphill battle.

### C.    Eleventh Amendment immunity

A lawsuit against state employees in their official capacities is the same as suing the state, which has immunity under the Eleventh Amendment for any claims for damages in an action brought pursuant to 42 U.S.C. § 1983.  See  Quern v. Jordan, 440 U.S. 332 (1979); Edelman v. Jordan, 415 U.S. 651 (1974); Monroe v. Arkansas State University, 495 F.3d 591, 594 (8th Cir. 2007); Alsbrook v. City of Maumelle,184 F.3d 999, 1010 (8th Cir. 1999); see also Kentucky v. Graham, 473 U.S. 159, 166-167 (1985) (discussing distinctions between individual and official capacity claims).  Also, a state and its agencies are not proper party defendants as they are not "persons" as defined by § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 64 & 70 (1989); Alsbrook v. City of Maumelle, 184 F.3d at 1010.  Consequently, the claims for damages against the defendants in their official capacities must also be denied on Eleventh Amendment grounds.

### D.    Claim for injunctive relief

In addition to the fact that Greywind does not have a viable Eighth Amendment claim, the only request for injunctive relief that is fairly within the scope of his complaint has been mooted by the fact his tooth has now been lost.

### E.    Request for class certification

Greywind's motion for class certification should be denied as moot.

**IV.** **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is recommended that defendants' Motion for Summary Judgment (Docket No. 26) be **GRANTED**; that Greywind's complaint (Docket No. 5) be **DISMISSED WITH PREJUDICE** and that Greywind's Motion for Class Certification (Docket No. 23) be **DENIED AS MOOT**.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 12th day of September, 2011.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge